UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DEMERIS TOLBERT,

       Plaintiff,

    v.

ANN MARIE T. SULLIVAN, et al.,

       Defendants.

19-CV-1691-JLS

## DECISION AND ORDER

*Pro se* Plaintiff Demeris Tolbert, a prisoner currently confined at Five Points

Correctional Facility, brings this civil rights action seeking relief under 42 U.S.C.

§ 1983.  He alleges that Defendants violated his rights under the First, Eighth, and

Fourteenth Amendments to the United States Constitution during his incarceration

at Upstate Correctional Facility ("Upstate"), Attica Correctional Facility ("Attica"),

Southport Correctional Facility ("Southport"), and Five Points Correctional Facility

("Five Points").

As discussed below, because the claims related to Tolbert's Upstate

confinement are based on wrongdoing alleged to have occurred in the geographical

confines of the Northern District of New York, they are severed and transferred to

the United States District Court for the Northern District of New York.

With respect to Tolbert's remaining claims, this Court previously granted

him leave to proceed *in forma pauperis* and screened his original Complaint (Dkt. 1)

for sufficiency.  Several claims were dismissed with leave to replead.  Dkt. 23.

Currently before the Court is Tolbert's Amended Complaint (Dkt. 30), which is also subject to initial review under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a).  For the reasons stated below, certain claims shall proceed to service and others are dismissed with prejudice.

## DISCUSSION

### I.  Northern District Claims

Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party and proceed with that claim separately.  Fed. R. Civ. P. 21.  In deciding whether to sever a claim, a court should consider the following factors:

> (1) whether the claims arise out of the same transaction or occurrence;
> (2) whether the claims present some common questions of law or fact;
> (3) whether settlement of the claims or judicial economy would be facilitated;
> (4) whether prejudice would be avoided if severance were granted; and
> (5) whether different witnesses and documentary proof are required for the separate claims.

*Rodriguez v. Winski*, 973 F. Supp. 2d 411, 430 (S.D.N.Y. 2013) (quoting *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 214 F.R.D. 152, 155 (S.D.N.Y. 2003)).

Although Tolbert has chosen to bring his case in this District, the operative facts underlying the claims against several Defendants did not occur here.  Dkt. 30 at 33-39; *see Keitt v. New York City*, 882 F. Supp. 2d 412, 459 (S.D.N.Y. 2011) (A plaintiff's "choice of forum is accorded less deference . . . where plaintiff does not reside in the chosen forum and the operative facts did not occur there.").  Where the administration of justice "would be materially advanced by severance and transfer,

2

a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants." *Cain v. New York State Bd. of Elections*, 630 F. Supp. 221, 225-26 (E.D.N.Y. 1986) (citing *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968)). A decision to sever "lies within the discretion of the Court." *Id.* at 225.

Tolbert's claims related to wrongdoing alleged to have occurred in the Northern District of New York are more appropriately heard in that district. Those claims are separate and distinct from the claims arising out of alleged wrongdoing in the Western District during Tolbert's incarceration, and will largely require different witnesses and documentary proof. The remaining factors also support severance.

Therefore, pursuant to Federal Rule of Civil Procedure 21 and 28 U.S.C. § 1404(a), the claims arising in the Northern District of New York, along with the Defendants associated with them, are severed from this action. Accordingly, Defendants John Doe Psychiatrist, Corrections Officer ("CO") Simmons, and CO Crossman, and all claims against them are severed and transferred to the Northern District. Dkt. 30 at 33-39.

## II.   <u>Western District Claims</u>

### A.   **Legal Standard**

Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The court shall

3

dismiss a complaint in a civil action in which a prisoner seeks redress from a

governmental entity, or an officer or employee of a governmental entity, if the court

determines that the action (1) fails to state a claim upon which relief may be

granted, or (2) seeks monetary relief against a defendant who is immune from such

relief. *See* 28 U.S.C. § 1915A(b)(1)-(2).

In evaluating a complaint, the court must accept all factual allegations as

true and must draw all inferences in the plaintiff's favor. *See Larkin v. Savage*, 318

F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d

Cir. 1999). "Specific facts are not necessary," and a plaintiff "need only 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007) (internal quotation marks and citation omitted); *see also*

*Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir. 2008) ("[E]ven after *Twombly*,

dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most

unsustainable of cases."). Although "a court is obliged to construe [pro se] pleadings

liberally, particularly when they allege civil rights violations," *McEachin v.*

*McGuinnis,* 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must

meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure.

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004).

To state a valid claim under 42 U.S.C. § 1983, "the plaintiff must allege that

the challenged conduct (1) was attributable to a person acting under color of state

law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the

4

Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). Section 1983 itself creates no substantive rights; "it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

To establish liability under Section 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the chain of command. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Moreover, the theory of *respondeat superior* is not available in a Section 1983 action. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). There is no "special rule for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020). Instead, a plaintiff must plead and prove that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (internal quotation marks omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

## B.    The Amended Allegations[1]

Tolbert brings several claims against more than 100 Attica and Southport correction officers ("COs"), staff members, and supervisors in the New York State

---

[1] The recitation of facts is drawn from the Amended Complaint, the contents of which must be accepted as true for purposes of initial review. *See Erickson*, 551 U.S. at 93-94.

Department of Corrections and Community Supervision ("DOCCS"). *See generally*
Dkt. 30. Liberally construed, the Amended Complaint alleges unconstitutional
conditions of confinement while Tolbert was incarcerated at Attica and Southport,
as set forth in more detail below.

### 1.    Attica Allegations

After several years in DOCCS custody, Tolbert arrived at Attica on January
19, 2018. Dkt. 30 at 39. An Attica correction officer, CO Dusza, immediately
started harassing and threating Tolbert, telling him "that he was going to get
punished for . . . grabbing that officer's handgun during that medical trip at"
Upstate Correctional Facility. *Id.* In the following weeks, Dusza would
"occasionally deny [Tolbert] access to showers, cleaning supplies and recreation,"
and "certain food items" would be missing from Tolbert's food tray when Dusza was
working in Tolbert's area. *Id.* at 39-40. COs Reddien and Norton advised Tolbert
that filing grievances against the prison staff "would only make matters wors[e]."
*Id.* at 40. In August 2018, Superintendent Noeth assured Tolbert that he would
take care of the denial of showers and cleaning products and, from then on, Dusza
stopped denying Tolbert showers, cleaning supplies, and recreation. *Id.*

Nonetheless, in November 2018, Tolbert overheard Dusza loudly state to
Defendant Clary, the Deputy Superintendent of Security, that "Tolbert has a
problem" and Clary then refer to "Tolbert" repeatedly over the telephone. *Id.* at 41,
82. The next day, Dusza claimed that he had a copy of Tolbert's "rap sheet" and
other related documents, and noted that Tolbert had prior charges. *Id.* at 41-42.

6

Defendants Dusza, Robin, Norton, Scheusslers[2], James, and Ellis made false
accusations against Tolbert, including accusations that are Tolbert says are "the
quickest way to get an inmate hurt or killed" by other inmates. *Id.* at 42. After
that, every CO working in the SHU would call Tolbert "no good," among other
names. *Id.* at 43, 83. Tolbert filed a grievance complaining that certain documents
were being released to the staff, and Attica Superintendent Noeth agreed to look
into the matter at Tolbert's request. *Id.* at 44.

Tolbert states that the officers' "disrespectful" name calling "automatic[ally]"
puts an inmate's "life in grave danger." *Id.* Tolbert's food and commissary items
also went missing, and "after weeks of being psychologically tortured," Tolbert
"decided that he would rather die or kill a" CO than continue enduring it. *Id.* After
having "a panic attack" on January 16, 2019, Tolbert made a "spear gun" and
stabbed CO Rasmussen. *Id.* at 45. Tolbert was then stripped searched, provided
with only a green hospital gown and two large "smock" blankets, and placed in "a
contraband watch room" in Attica's hospital area. *Id.* at 45-46. He was not
provided with toilet paper, towels, sheets, wash rag, toothpaste, toothbrush,
cleaning supplies, or clothes. *Id.* at 46. Tolbert was not allowed to urinate or
defecate until the sergeant arrived, and he was required to have two or three "clean
defecation[s]" before he could be returned to his SHU cell. *Id.*

Defendants CO John Does 1-45, who were assigned to Tolbert's watch room,
recorded Tolbert's activities, aided CO John Doe #46 in spraying an unknown

---

[2] The spelling of this Defendant's name varies throughout the pleadings.

chemical into Tolbert's room through the vent, and caused Tolbert to defecate on the watch room floor when the sergeant's arrival was delayed. *Id.* at 48-50. Tolbert was also mocked by these COs while they denied him a shower, use of a urine bucket, tooth brushing, and clothing. *Id.* at 50-51. They further "allowed John Doe [#46] to sit next to them while he climb[ed] in" and out of Tolbert's watch room "vent" for "15 days straight" and spray the room with an "unknown chemical agent." *Id.* (parenthesis omitted). These COs, along "with other unknown officers" would line up "next to" the watch room door and threaten to throw tear gas "so they could kill [Tolbert]." *Id.* at 51.

Tolbert provided 10 to 12 clean defecations, more than the two to three required, yet he was forced to remain in the watch room from January 16, 2018 to approximately February 29, 2018. *Id.* at 52. CO Doe #46, however, continued to subject Tolbert to the chemical spray until Tolbert was transferred out of Attica on March 28, 2018. *Id.* at 52-53. A few days after Tolbert was placed in the watch room, he "fell unconscious" due to the chemical spray and was rushed to the Attica hospital by stretcher. *Id.* at 53. As he started to regain consciousness, Defendant CO James directed the nurse to give him "a cloth with some type of chemical so that he could smother plaintiff to death." *Id.* James did not follow through, however, and Tolbert later learned that he was being mocked. *Id.* at 54.

Tolbert spoke via telecom with a doctor about the chemical spray and death threats, and the doctor ordered that he be placed in a hospital room. *Id.* at 54-55. The COs, however, "brought [him] back to the same watch room," and Tolbert asked

Nurse Nelson to accompany them out of fear for his life. *Id.* at 55. Upon Tolbert's return to the watch room, CO John Doe #46[3] crawled back into the vent and continued to spray. *Id.*

When Tolbert was finally seen by Nurse Practitioner ("NP") Graf and another nurse (after he refused to remove his arm from the food slot hatch in protest), she smelled the chemical spray as soon as she entered the room. *Id.* at 56. The prison imam arrived during Graf's examination and, although Tolbert told him that he was being "tortured" and "sprayed," the imam did nothing to help. *Id.* at 56-57. After 65 days of being "tortured," Tolbert again raised these complaints to the imam, who took notes but no action. *Id.* 57-58.

When Tolbert attempted to speak to Superintendent Noeth about his conditions of confinement, Noeth replied: "Don't talk to me after you had assaulted one of my officers." *Id.* at 58-59. Noeth then signed the watch room logbook and walked off. *Id.* at 59. After being returned to his regular SHU cell and speaking to Noeth on four separate occasions, Tolbert continued to be denied showers, hot water, toothpaste and a toothbrush, sheets, clothes, towels, headphones, mail, and all property. *Id.*

Sgt. Long issued a misbehavior report against Tolbert for the aforementioned food slot incident. *Id.* at 60. Tolbert informed Long that he was being denied a toothbrush, toothpaste, hygiene supplies, and the urine jug. *Id.* Long had Tolbert

---

[3]Although it is unclear whether more than one individual participated in the alleged spraying, the accused will be referred to as John Doe #46 throughout this Order. *See id.* at 73.

moved to another watch room; however, five or ten minutes after Plaintiff's arrival,

CO John Doe #46 climbed back in the vent and said, "SHHHHH, SHHHH, SHHHH,

Die, Die, Die." *Id.* at 60-61. Long participated in falsifying the watch room logs to

keep Tolbert on watch even after he had the required number of defecations. *Id.* at

61. Tolbert notified Deputy Superintendent Wilcott that he was being sprayed,

denied all hygienic supplies, and held in the watch room longer than necessary, but

she responded that he needed two to three clean defecations and left. *Id.* at 61-62,

63. Watch room officers began giving Tolbert the urine jug more frequently and

provided a water bucket to clean up the urine. *Id.* at 62-63.

Tolbert advised Wilcott repeatedly that he was been denied most necessities,

including, but not limited to, showers, clothes, all property, hot water, towels,

blanket, sheets, and cleaning supplies, but no action was taken. *Id.* at 63. Tolbert

also continued to complain to NP Graf about the ongoing chemical spray in the

"extremely cold" watch room and his resulting chest pains, dizziness, and

stomachaches. *Id.* at 64. NP Graf did nothing, even though she was aware that

other nurses were coughing within a few feet of Tolbert's watch room. *Id.* at 64-65.

At some point during his watch room confinement, Tolbert "fell unconscious"

and was "rushed" to the Warsaw Hospital Emergency Room ("ER"). *Id.* at 65. The

ER nurse advised the prison staff that the doctor wanted to keep Tolbert in the

hospital for a few days, but Superintendent Noeth wanted him sent back to Attica.

*Id.* at 67. EMT John and Jane Does removed Tolbert's tubes and transported him,

semi-conscious, back to Attica without further examination. *Id.* at 68. After

10

returning from the hospital, Tolbert continued to be sprayed with chemicals, and Graf stopped responding to his requests for medical care. *Id.* at 65-66.

While returning from the hospital, Tolbert was removed from his wheelchair by Sgt. John Doe and two other John Doe COs and had to walk in the freezing cold weather in full restraints. *Id.* at 69. Superintendent Noeth sent Tolbert back to the same cold, "stinking" contraband room instead of putting him in a hospital room during his recovery. *Id.* Tolbert advised Defendant Clinton on numerous occasions that he was being denied all clothing, showers, property, mail, sheets, recreation, headphones, and hygiene products, but Clinton took no action. *Id.* at 70-72. Clinton also viewed Tolbert's "empty" cell. *Id.* at 71. Clinton took notes regarding the chemical spray because other SHU inmates had made complaints and experienced chest pains. *Id.* at 72-73.

Nurse Jane Doe (identified as Defendant #62), worked on the watch room floor during Tolbert's last week, and he saw her coughing, making jokes about the chemical spray, and sitting next to John Doe #46. *Id.* at 74-75. She also witnessed the watch room COs line up for mock drills six times, pretending to rush into his cell without actually entering. *Id.* at 75-76. Tolbert was sprayed with chemicals in the watch room for a total of 15 days and then sprayed in his SHU cell for an additional 60 days. *Id.* at 73. He experienced sleep deprivation, chest pains, two hospitalizations, and lasting psychological damage, among other injuries, as a result. *Id.* at 74.

11

From about February 1, 2018 to late March 2018, COs Norton, Ellis, Robin, Scheusslers, and James denied Tolbert clothing (except a green smock), hot water, soap, cleaning supplies, his personal property, sheets/blanket, "legal work," footwear, recreation, mail, towels, toothbrush, toothpaste, and headphones. *Id.* at 77-78. Another CO John Doe denied Tolbert showers from January 16 to late March 2018. *Id.* at 78-79. Tolbert's mental health counselor, Ms. Hayes, to whom he spoke daily, was aware of his conditions, the chemical spray, and denial of showers, but she failed to take any action. *Id.* at 80-82. Clary, to whom Tolbert also spoke about his conditions of confinement, "said [that] he would look into it," but also took no action on Tolbert's behalf. *Id.* at 85.

From November 1, 2018 to March 2019, Clary, Norton, James, Ellis, Robin, and Scheusslers would gather around the morning mail and loudly discuss Tolbert's legal mail. *Id.* at 83. James, Robin, Norton, or Ellis failed to put Tolbert's outgoing mail in the mailbox on a few occasions, despite stating that they had. *Id.* at 84. On at least two occasions, Dusza gave Tolbert's mail to another inmate. *Id.* Attica's religious leaders, the imam, the pastor, and the Nation of Islam ("NOI") chaplain, who each visited Tolbert's cell on two or three occasions, also failed to act "when they saw for themselves" that he was being sprayed with a chemical agent and denied all "human necessities." *Id.* at 86-87.

Tolbert spoke to Attica Mental Health Deputy Director Jane Doe about his unconstitutional living conditions and nonstop harassment on two or three occasions, and she observed his empty cell and lack of clothing. *Id.* at 88. At one

12

point, Tolbert made a threatening remark, and she reported the threat to security
but took no action concerning his conditions. *Id.* at 88-89. Tolbert spoke to the
Attica Acting Assistant Deputy of Administration two or three times and, "just like
all of the Defendants[,] he took written notes but did nothing and the torture and
abuse continued." *Id.* at 89-90.

### 2.   Southport Allegations

Defendant Clary "had officers at Southport," and they continued to release
Tolbert's documents, make death threats, and continuously tell Tolbert to "SHHH,
SHHH, SHHH" over the SHU intercom and radio. *Id.* at 90. Tolbert wrote a letter
complaining to Defendants Picolo, Benettizzi, and Annucci complaining about
Southport's policy of restraining all incoming level one SHU inmates, regardless of
whether they are considered violent, "in a secured steel recreational cage" for 30
days. *Id.* at 91-92. The inmates are denied written notice of this restraint and the
ability to appeal. *Id.* at 92-93. Tolbert was on level one restraint for 150 days, and
only Picolo and Annucci responded to his letter. *Id.* at 93. Picolo denied Tolbert all
personal property, legal mail, and photos for approximately one year. *Id.* at 94.
Upon filing a claim for the property, Tolbert received only some items after one to
three months and was told that the rest was lost. *Id.* However, when Tolbert was
transported to Five Points on March 9, 2020, he received all the property that was
withheld during his Southport confinement. *Id.* at 95.

Upon arrival at Southport, Tolbert realized that Clary ordered Southport
officials to continue his "smear campaign" and torture tactics. *Id.* at 96. After two

13

weeks, Tolbert was moved to B gallery and unknown officer John Doe (3:00 PM to
11:00 PM shift) went into another inmate's cell, stated that Plaintiff was "no good,"
and handed the inmate what Tolbert believed to be sealed documents related to his
criminal history. *Id.* at 96-97. John Doe later offered certain inmates $300.00 to
$400.00 to "hurt" Tolbert "on video and audio." *Id.* at 97. Tolbert was tormented for
two months by the officer saying "SHHH" repeatedly in the wall radio. *Id.* at 98.
He then advised two mental health counselors, Mr. Kress and Ms. Allen, about the
threats and that he had a weapon in his cell. *Id.* The aforementioned John Doe
continued to try to bribe inmates to harm Tolbert, while another John Doe (D-Block
11:00 PM to 7:00 AM shift) made accusations about Tolbert every morning in front
of the SHU inmates. *Id.* at 99.

    When Tolbert went to Wyoming County Court on criminal charges for
assaulting CO Rasmussen, he told Investigator Jane Doe that he was being tortured
by the Attica and Southport staff. *Id.* at 101-02. Tolbert also spoke about these
issues to an Albany mental health department employee, John Doe, but "nothing
was done." *Id.* at 102. Tolbert repeatedly told Sergeant Moore that his staff,
including CO Mosher, made accusations about Tolbert while escorting him back and
forth from recreation. *Id.* at 103.

    On June 9, 2019, Tolbert tried to cut Mosher with two homemade razors, but
Mosher and Vaughan were able to restrain Tolbert on the ground, and they later
falsified a misbehavior report by describing him as having only one weapon. *Id.* at
104-05. By falsifying the report, they were able to keep the incident quiet and

continue to "torture" Tolbert in D- Block. *Id.* at 105-06. On October 1, 2019, Tolbert stabbed CO Vanderpool in the abdomen with a homemade icepick. *Id.* at 106.

With respect to Tolbert's medical needs, he arrived at Southport with a medical permit for a knee brace. *Id.* at 107. He was examined by an orthopedic specialist in 2017, and he takes "Cymbalta for pain" and has medical boots due to injuries and deformities in both feet from prior gunshot wounds. *Id.* at 107-08. He has permanent "metal rods in" his "hip, femur and knee area with torn arteries [and] tarsal tunnel syndrome in [his] left ankle." *Id.* at 107. Tolbert was seen by PA Oaks on four occasions between March 15 and December 12, 2019 and requested a leg brace during that time. *Id.* at 108. Oaks did not "see a medical necessit[y] for [the] leg brace" and denied Tolbert's request. *Id.* Oaks also denied Tolbert's "prescribed knee brace" for approximately nine months. *Id.* at 108-09. Tolbert is "partially disable[d]," and can "work but to a minimum"; he cannot use stairs or sit "for long periods of time." *Id.* at 110.

From July to December 2019, Oaks denied Tolbert prescription eyeglasses, which he needed due to vision damage caused by the excessive lighting in his cell from 7:00 A.M. to 10:30 P.M. each day. *Id.* at 111, 117-19. He experienced "blurry vision," headaches, and "seeing white and dark spots occasionally," in addition to eye pain, for which he requested medication. *Id.* On December 9, 2019, Tolbert was seen by an eye doctor who found "some eye damage" and referred him to an ophthalmologist, who confirmed the damage. *Id.* at 111-12, 119. Tolbert was finally

taken to Elmira Correctional Facility after he was denied access to the eye doctor for seven to eight months "straight." *Id.* at 113.

Further, although Tolbert also "suffers from an unknown" food allergy and "has other stomach issues with digestion," Oaks denied his "prescribed . . . controlled" diets. *Id.* at 113-14. Tolbert had stomach surgery in 2017 or 2018 and was prescribed three "stomach medications," which he has been taking ever since. *Id.* at 114. Oaks would not order the controlled diet until Tolbert "was first seen by [a] gastro-specialist," which he did on December 9, 2019. *Id.* at 115-16.

Tolbert was seen by Dr. Siddiqi, a psychiatrist, in May and June 2019, and he described the panic attacks, paranoia, anxiety, and violent behavior caused by being exposed to COs that he had previously attacked. *Id.* at 120-21. Dr. Siddiqi responded: "What do you want from mental health?" and failed to prescribe any "psycho-tropic medications or programming." *Id.* at 121. "As a result," a few weeks later, Tolbert "stabbed two correctional officers on two separate occasions and one" could have lost "his life." *Id.*

Tolbert was seen by another psychiatrist in November 2019, and while Dr. Gonzalez did prescribe psychiatric medications, he failed to address Tolbert's need for a mental health program or recommend a "'a safer environment." *Id.* at 123-24. Tolbert was also found incompetent to stand trial in Wyoming County Court at this time and was denied psychiatric care despite needing to be sent to a psychiatric hospital at the time of this finding. *Id.* at 124-25. Tolbert's mental health counselor, Mr. Kress, treated Tolbert during 20 private sessions and received "over

16

a half-dozen letters concerning" Tolbert's treatment at Southport but refused to
help him. *Id.* at 126-30.

Tolbert also spoke to the SHU counselor, Mr. Micheler, on a regular basis,
and although he was aware that Tolbert was being "tortured," Micheler "hadn't
heard" about Tolbert assaulting Mosher and Vanderpool and "continued to say" that
Southport was Tolbert's "last stop." *Id.* at 133-36. Micheler failed to act, file a
complaint on Tolbert's behalf, or inform Albany of the situation even after Tolbert
was involved in four separate staff assaults. *Id.* at 135-37. Micheler did, however,
file a misbehavior report against Tolbert for stating that "he would defend himself if
need be." *Id.* at 137-38.

Tolbert had "no other alternative but to refuse" to be interviewed by the
Inspector General about his complaints because "once an inmate is labelled (called)
'no good' by staff, if an inmate does speak to an Inspector General, they
automatically will be signing their death certificate while in prison." *Id.* at 133.

### 3.    Five Points Allegations

Upon his transfer from Southport to Five Points, Tolbert's prescribed
controlled diet was approved by the Five Point doctor; however, it was later denied
by the "civilians who control[] the mess hall," Food Administrator John/Jane Doe.
*Id.* at 141-43. The mess hall supervisors "claimed that they did not receive the first
diet request form that was signed and approved by Dr. Wright" on August 31 or
September 1, 2020. *Id.* at 143. In mid-September, the medical staff spoke to the
mess hall supervisor and Tolbert received his prescribed diet for two or three days

before it was cancelled by the supervisor. *Id.* at 144-46. Even after Dr. Wright changed the diet form language at the mess hall supervisor's request, Tolbert alleges that he was denied his medical diet for the seven months prior to filing his complaint. *Id.* at 147-48. Tolbert's follow-up appointment with the gastro-specialist had to be cancelled due to the COVID-19 pandemic. *Id.* at 149.

## C.   Constitutional Claims

### 1.   Retaliation

It is well settled that prison officials may not retaliate against prisoners for exercising their constitutional rights. *See generally Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). To state a Section 1983 retaliation claim, a prisoner must present allegations that (1) he was engaged in constitutionally protected conduct, and (2) the punishment imposed by the prison official was motivated by this protected conduct. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). A finding of sufficient permissible reasons to justify state action is "readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (internal quotation marks omitted). Courts have recognized that prison retaliation claims are prone to abuse with respect to any decision that a prisoner may dislike. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)).

18

This Court previously concluded, in its July 24, 2020 Decision and Order, that Tolbert's retaliation claims were wholly conclusory and lacking any indication that the actions of the accused were motivated by protected conduct. Dkt. 23, at 15. The Amended Complaint fails to correct the Original Complaint's deficiencies and the retaliation claims are now dismissed with prejudice.

## 2.    Conditions of Confinement and Failure to Protect

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The assessment of whether those measures are reasonable is based on two factors. First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. Second, prison officials must be shown to have demonstrated a deliberate indifference to the inmate's safety. *Id.* Deliberate indifference must be measured subjectively, that is,

> a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to [the] inmate['s] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

Tolbert's Amended Complaint alleges sufficient facts to plead a claim of cruel and unusual punishment due to conditions of confinement, which denied Tolbert "the minimal civilized measure of life's necessities." *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). These facts also satisfy the subjective prong of Tolbert's claim. Thus, conditions of confinement

claims shall proceed to service against the following Defendants: CO John Doe #46 (spraying chemical agent); Sgt. John Doe and CO John Does (forcing Plaintiff out of his wheelchair to walk in freezing weather); the watch room CO John Does (freezing temperature and denial of toilet/urine jug, supplies, and showers (Dkt. 30 at 47-53)); John Does (non-watch room denial of showers, *see id.* at 5) and Dusza, Wilcott, Long, James, Ellis, Robin, Scheusslers, and Norton (denial of property, mail, hygiene/cleaning supplies, clothes/covers, and showers).

Turning to Tolbert's failure-to-protect claims, it is well settled that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *see also Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012) ("Because plaintiffs properly allege at least one constitutional violation, plaintiffs are entitled to discovery to determine which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene."). Based on their involvement as described in the allegations presented above, Tolbert has stated failure-to-protect claims sufficient to proceed to service against Defendants Noeth, Clary, Clinton, Wilcott, Long, NP Graf, Attica Imam John Doe, Nurse Jane Doe (Dkt. 30 at 74-76 (watch room)), Acting Assistant Deputy of Administration John Doe, and Southport CO John Doe (bribing inmates to hurt Tolbert).

### 3.   Deliberate Indifference to Serious Medical and Mental Health Needs

The Second Circuit has noted that medical conditions vary in severity" and "a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Harrison v. Barkley*, 219 F.3d at 132, 136-37 (2d Cir. 2000) (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). For medical care to be so inadequate as to amount to the cruel or unusual punishment prohibited by the Eighth Amendment, a plaintiff must allege that the defendant's actions or omissions amounted to "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

The first component of such a claim requires that a plaintiff's medical condition be objectively serious.  A serious medical condition exists "where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison*, 219 F.3d at 136 (internal quotation marks omitted); *Banks v. Mannoia*, 890 F. Supp. 95, 99 (N.D.N.Y. 1995) ("The serious medical need requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.") (citing *Archer v. Dutcher*, 733 F.2d 14, 16-17 (2d Cir. 1984)).

The second component is subjective and requires a plaintiff to allege that the prison official had actual knowledge of his serious medical needs but was deliberately indifferent thereto. *See Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). It is well-settled that "not every lapse in prison medical care will rise to the level of a constitutional

21

violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).  In addition, if the treatment provided is adequate, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703.  In the context of mental health needs, "propensities to attempt suicide, harm oneself, and/or exhibit severe depression or anxiety attacks have been viewed as sufficiently serious." *Young v. Choinski*, 15 F. Supp. 3d 194, 199 (D. Conn. 2014) (internal quotation marks omitted) (citing *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (W.D.N.Y. 2013)). There must be proof that the prison official had knowledge of the risk to the plaintiff.  *See Young*, 15 F. Supp. 3d at 199.

Assuming Tolbert's allegations to be true at this stage of the litigation, *see Erickson*, 551 U.S. at 94, his denial of medical and mental health care claim shall proceed to service against Defendants NP Graf, Oaks, Dr. Siddiqi, Dr. Gonzalez, Attica Mental Health Deputy Director Jane Doe, Ms. Hayes, Mr. Kress, Mr. Micheler, and Five Points Food Administrator John/Jane Doe.

### 4.   Conspiracy

To the extent that Tolbert alleges that Defendant Clary conspired with Attica and Southport, because the Amended Complaint contains "only conclusory, vague, or general allegations of conspiracy," this claim must be dismissed.  *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983), *cert. denied*, 464 U.S. 857 (1983); *see also Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993).  Tolbert was advised in this Court's July 24, 2020 Decision and Order that he must present "facts demonstrating an agreement among two or more persons" to deprive him of his rights.  *James v.*

*Artuz*, No. 93 CIV. 2056 (LMM), 1998 WL 50206, at *5 (S.D.N.Y. Feb. 6, 1998) (citing *Whitfield v. Forest Elec. Corp.*, 772 F. Supp. 1350, 1352 (S.D.N.Y. 1991)); *see also* Dkt. 23, at 23-24. As he has failed to do so in the amended pleadings, his conspiracy claim must be dismissed.

Moreover, the doctrine of intracorporate conspiracy "bars conspiracy claims against employees of entities such as DOCCS (when those employees are alleged to have conspired solely with each other) unless, pursuant to the doctrine's scope of employment exception, the employees were pursuing personal interests wholly separate and apart from the entity by whom they were employed." *Richard v. Fischer*, 38 F. Supp. 3d 340, 353 (W.D.N.Y. 2014) (internal quotation marks omitted) (collecting cases). The amended allegations fail to present an exception to this doctrine. Tolbert's conspiracy claim, therefore, is dismissed with prejudice.

### 5.    Due Process

Tolbert asserts that Southport's Level I restraint policy for 30 days upon admission violated his due process rights. This claim is dismissed.

To prove a violation of due process, "a plaintiff must establish that (1) he possessed a liberty interest and (2) defendants deprived him of that interest without sufficient process." *Walker v. Fischer*, 523 F. App'x 43, 44 (2d Cir. 2013) (summary order). An inmate's protected liberty interest is implicated only where the conduct at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

This Court has held that a plaintiff "cannot state a due process violation based on the application of mechanical restraints as Plaintiff had no liberty interest in remaining free of such restraints so as to trigger due process protections." *Goodwin v. Hungerford*, No. 12-CV-00362A F, 2014 WL 1219050, at *4 (W.D.N.Y. Mar. 24, 2014), *report and recommendation adopted*, No. 12-CV-362, 2015 WL 1431675 (W.D.N.Y. Mar. 27, 2015) (citing *Brown v. Coughlin*, No. 93-CV-0633E(H), 1995 WL 643349, at *3 (W.D.N.Y. Oct. 13, 1995) (finding that placing an inmate in mechanical restraints does not impose the "atypical and significant hardship" envisioned in *Sandin*) (cited by *Ruggiero v. Fischer*, No. 15-CV-00962-RJA-JJM, 2018 WL 7892966, at *5 (W.D.N.Y. Sept. 27, 2018), *report and recommendation adopted sub nom. Ruggiero v. Fisher*, No. 15-CV-962-A, 2019 WL 1438810 (W.D.N.Y. Apr. 1, 2019), *aff'd sub nom. Ruggiero v. Fischer,* 807 F. App'x 70 (2d Cir. 2020) ("[W]e conclude that the challenged use of mechanical restraints is not an atypical hardship when compared to the ordinary incidents of prison life.")). Because Tolbert was given an opportunity to amend his pleadings, this claim is dismissed with prejudice.

**D.    John Doe and Jane Doe Defendants**

Pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997) (per curiam), the Court requests that the New York State Attorney General attempt to ascertain the full names of the numerous Jane Doe and John Doe Defendants.  The Attorney General is also requested to obtain and provide the addresses where these Defendants can currently be served.  The Attorney General need not undertake to

defend or indemnify such individuals at this juncture.  This Order merely provides a means by which Tolbert may name and properly serve the Defendants as instructed by the Second Circuit in *Valentin*.

The Attorney General is hereby requested to produce the identities of these Defendants within **35 days from the date of this Order**.  The information shall be forwarded to the Court's Pro Se Unit, United States District Court, 2120 Kenneth B. Keating Federal Building, 100 State Street, Rochester, New York 14614.  Once this information is provided, the Complaint shall be deemed amended to reflect the full names of the Defendants, summonses shall issue, and service is directed, as provided below, without further order.

E.     <u>**Supervisory Defendants**</u>

With respect to the supervisory Defendants, as stated above, Tolbert must allege the personal involvement of each party.  *See McKenna*, 386 F.3d at 437; *Colon*, 58 F.3d at 873.  Prison officials cannot be deemed personally involved in the alleged conduct merely because they are DOCCS leaders or links in the prison facility's chain of command.  The Amended Complaint fails to present allegations of personal involvement as to Defendants Annucci, Picolo, and Benettizzi.  *See Tangreti*, 983 F.3d at 618 (holding that plaintiff must plead that each official, "through the official's own individual actions, has violated the Constitution . . . . "). They are dismissed from this action.

**F.**   **Tolbert's Request to Redact his Amended Complaint**

Tolbert asks this Court to redact portions of his Amended Complaint.  Dkt. 32 at 18-19.  The Court grants that request, in part, for the same reasons set forth in its Decision and Order dated March 4, 2020.  *See* Dkts. 11-12.  The Court denies Tolbert's request to redact his references to "bribing SHU inmates to hurt plaintiff by offering money" because Tolbert identifies no appropriate basis for redaction.  Dkt. 32 at 18-19.  A redacted version of the Amended Complaint will be re-docketed after this Decision and Order is filed.  The Court will also docket a redacted version of Tolbert's letter request for redaction.  Dkt. 32, at 18-19.  **In any future filings, Tolbert shall comply with the redaction requirements of Federal Rule of Civil Procedure 5.2(a).**

## CONCLUSION

For the reasons discussed above, Tolbert's claims against Defendants John Doe Psychiatrist, CO Simmons, and CO Crossman are severed and transferred to the Northern District of New York.

Tolbert's retaliation, conspiracy, and due process claims are dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A.

The following claims may proceed to service: **conditions of confinement claims** against CO John Doe #46 (spraying chemicals), Sgt. John Doe and CO John Does (forcing Tolbert out of his wheelchair), watch room John Does (freezing temperature and denial of toilet/urine jug, supplies, and showers), John Does (non-watch room denial of showers), Dusza, Wilcott, Long, Ellis, James, Robin,

Scheusslers, and Norton (denial of mail, property, clothes/covers, hygiene/cleaning supplies, and showers); **failure to protect claims** against Noeth, Clary, Clinton, Wilcott, Long, NP Graf, Attica Imam John Doe, Nurse Jane Doe (Dkt. 30 at 74-76 (watch room)), Attica Acting Assistant Deputy of Administration John Doe, and Southport CO John Doe (bribing inmates to hurt Tolbert); and **deliberate indifference to serious medical and mental health needs claims** against NP Graf, Oaks, Dr. Siddiqi, Dr. Gonzalez, Attica Mental Health Deputy Director Jane Doe, Ms. Hayes, Mr. Kress, Mr. Micheler, and Five Points Food Administrator John/Jane Doe.  All other named Defendants are terminated from this action.

## ORDER

IT HEREBY IS ORDERED that Tolbert's claims against Defendants John Doe Psychiatrist, CO Simmons, and CO Crossman are severed and transferred to the Northern District of New York; and it is further

ORDERED that Tolbert's retaliation, conspiracy, and due process claims are dismissed with prejudice; and it is further

ORDERED that the Clerk of Court is directed to cause the United States Marshal to serve copies of the Summons, Amended Complaint, and this Order upon the following Defendants: CO John Doe #46 (spraying chemicals), Sgt. John Doe and CO John Does (forcing Tolbert out of his wheelchair), watch room John Does (freezing temperature and denial of toilet/urine jug, supplies, and showers), John Does (non-watch room denial of showers), Attica Imam John Doe, Nurse Jane Doe (Dkt. 30, at 74-76), Attica Acting Assistant Deputy of Administration John Doe, and

Southport CO John Doe (bribing inmates to hurt Tolbert), Attica Mental Health Deputy Director Jane Doe, and Five Points Food Administrator John/Jane Doe, once identified; Dusza, Wilcott, Long, Ellis, James, Robin, Scheusslers, Norton, Noeth, Clary, Clinton, Graf, Oaks, Siddiqi, Gonzalez, Kress, Hayes, and Micheler, without Tolbert's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Tolbert's favor; and it is further

ORDERED that all other named Defendants are terminated from this action; and it is further

ORDERED that the Clerk of Court is directed to forward a copy of the Summons, Amended Complaint and this Order by email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional Office <Michael.Russo@ag.ny.gov>; and it is further

ORDERED that the New York State Attorney General provided the full names and addresses of the numerous Jane Doe and John Doe Defendants, to the extent possible, within 35 days; and it is further

ORDERED that, pursuant to 42 U.S.C. § 1997e(g)(2), Defendants are directed to answer the Amended Complaint upon service.

SO ORDERED.

Dated:     April 29, 2021
           Buffalo, New York

                                        _____
                                        JOHN L. SINATRA, JR.
                                        UNITED STATES DISTRICT JUDGE